Case No. 15-10311

# In the United States Court of Appeals
## for the Fifth Circuit

FREDRIC RUSSELL MANCE, JR., TRACEY AMBEAU HANSON, ANDREW HANSON, AND CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS,

Plaintiffs-Appellees,

v.

JEFFERSON B. SESSIONS, III, U.S. ATTORNEY GENERAL; AND THOMAS E. BRANDON, ACTING DIRECTOR, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

Defendants-Appellants.

Appeal from a Judgment of the United States District Court for the Northern District of Texas, the Hon. Reed O'Connor, District Judge (Dist. Ct. No. 4:14-CV-539-O)

APPELLEES' PETITION FOR REHEARING EN BANC

William B. Mateja
POLSINELLI P.C.
2950 N. Harwood, Suite 2100
Dallas, TX 75201
214.397.0030/Fax 214.397.0033

Alan Gura
 Counsel of Record
GURA PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314
703.835.9085/703.997.7665

March 19, 2018

Counsel for Appellees

CERTIFICATE OF INTERESTED PERSONS

*Mance, et al.* v. *Sessions, et al.*, No. 15-10311

The undersigned counsel of record certifies that the following listed

persons and entities as described in the fourth sentence of Rule 28.2.1

have an interest in the outcome of this case. These representations are

made in order that the judges of this Court may evaluate possible

disqualification or recusal.

Plaintiffs:
Fredric Russell Mance, Jr., Tracey Ambeau Hanson, Andrew Hanson,
Citizens Committee For The Right To Keep And Bear Arms

Defendants:
Jefferson B. Sessions, III, Thomas E. Brandon

Plaintiffs' Counsel:
Alan Gura, Gura PLLC; William B. Mateja, Polsinelli P.C.

Defendants' Counsel:
Benjamin C. Mizer, Beth S. Brinkmann, John R. Parker, Mark B. Stern,
Michael S. Raab, Tara S. Morrissey, Lesley R. Farby, Daniel M. Riess –
U.S. Department of Justice

Amici Curiae:
The Brady Center to Prevent Gun Violence
The Law Center to Prevent Gun Violence
National Rifle Association of America, Inc.
National Shooting Sports Foundation, Inc.

<u>Counsel for Amicus Curiae Brady Center</u>:
Sean A. Lev
Matthew A. Seligman
Eduardo F. Bruera
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.

<u>Counsel for Amicus Curiae Law Center</u>:
John W. Sorrenti
Simon J. Frankel, Of Counsel
Covington & Burling LLP

<u>Counsel for National Rifle Associaton of America, Inc.</u>:
Charles J. Cooper
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
Cooper & Kirk, PLLC

<u>Counsel for National Shooting Sports Foundation, Inc.</u>:
Lawrence G. Keane
Kristin W. Roscoe
Michael L. Rice
Simon, Ray & Winikka LLP


/s/ Alan Gura
Alan Gura
Counsel for Appellees

STATEMENT PURSUANT TO FED. R. APP. P. 35(B)(1)

Never before has a federal appellate court upheld a restriction on the core Second Amendment right to keep arms under the guise of strict scrutiny. Nor, until now to Plaintiffs-Appellees' knowledge, has a federal appellate court denied an individualized as-applied constitutional challenge on grounds that the challenged scheme is facially valid.

The panel did just that in reversing the judgment below, notwithstanding Judge Owen's separate finding that "[t]he district court's reasoning is thoughtful, and it is correct in many respects." Op. at 20 (Owen, J., concurring). Yet the district court's opinion is also correct in the ultimate respect: if there exists a fundamental right to keep handguns, the federal government's prohibition of a national market for handguns cannot stand. Moreover, as the deprivation of plaintiffs' fundamental rights advances no coherent governmental interest—their "state" of residence authorizes the transactions that the federal government bars on an anti-circumvention rationale—plaintiffs' individualized as-applied challenge cannot be disregarded owing to the challenged scheme's asserted (but unproven) facial validity.

Plaintiffs-Appellees Fredric Russell Mance, Jr., a federal firearms licensee ("FFL"); two of his customers, wife and husband Tracey Ambeau Hanson and Andrew Hanson; and the Citizens Committee for the Right to Keep and Bear Arms, respectfully request en banc rehearing. The panel's novel decision contradicts Supreme Court and Fifth Circuit precedent regarding:

1. The functional requirements of strict scrutiny, including *Reed* v. *Town of Gilbert*, 135 S. Ct. 2218 (2015); *Ashcroft* v. *ACLU*, 542 U.S. 656 (2004); and *Dep't of Tex*. v. *Tex. Lottery Comm'n*, 760 F.3d 427 (5th Cir. 2014) (en banc); and

2. The nature of individualized as-applied constitutional challenges as distinguished from facial challenges, including *Wis. Right to Life, Inc*. v. *FEC*, 546 U.S. 410 (2006) (per curiam); *Exelon Wind 1, L.L.C.* v. *Nelson*, 766 F.3d 380 (5th Cir. 2014); and *In re Cao*, 619 F.3d 410 (5th Cir. 2010) (en banc).

En banc review is essential to maintain decisional uniformity, and to consider the questions of exceptional importance inherent in this case.

# TABLE OF CONTENTS

Certificate of Interested Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Statement Pursuant to Fed. R. App. P. 35(b)(1). . . . . . . . . . . . . . . . .  iii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vi

Issues Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

The Course of Proceedings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

    1. *The Regulatory Scheme*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

    2. *The Scheme's Application Against Plaintiffs*. . . . . . . . . . . . . . . . .  8

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

    I.  In Upholding the Infringement of a Fundamental Right,
       the Panel Asserted, But Did Not Apply, Strict Scrutiny. . . . . . . .  11

    II. The Panel Erred in Asserting that Facial Validity Precludes
        an As-Applied Challenge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
Appendix:  Panel Opinion

# TABLE OF AUTHORITIES

Cases

*Ashcroft* v. *ACLU*,
    542 U.S. 656 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv, 12

*Dep't of Tex.* v. *Tex. Lottery Comm'n*,
    760 F.3d 427 (5th Cir. 2014) (en banc). . . . . . . . . . . . . . . . . . . . iv, 12

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 12

*Exelon Wind 1, L.L.C.* v. *Nelson*,
    766 F.3d 380 (5th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . iv, 18

*Harrott* v. *County of Kings*,
    25 Cal.4th 1138, 25 P.3d 649 (2001) . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Cao*,
    619 F.3d 410 (5th Cir. 2010) (en banc). . . . . . . . . . . . . . . . . . . . iv, 18

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco,*
    *Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012) . . . . . . . . . . . . 11

*Ohralik* v. *Ohio State Bar Ass'n*,
    436 U.S. 447 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-17

*O'Reilly* v. *Bd. of Appeals*,
    942 F.2d 281 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Peoples Rights Org.* v. *City of Columbus*,
    152 F.3d 522 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Reed* v. *Town of Gilbert*,
    135 S. Ct. 2218 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . iv, 12, 17

*Springfield Armory* v. *City of Columbus*,
  29 F.3d 250 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Supreme Court of New Hampshire* v. *Piper*,
  470 U.S. 274 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Edge Broad. Co.*,
  509 U.S. 418 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*United States* v. *Marcavage*,
  609 F.3d 264 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Ward* v. *Rock Against Racism*,
  491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Wash. State Grange* v. *Wash. State Republican Party*,
  552 U.S. 442 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Whole Woman's Health* v. *Hellerstedt*,
  136 S. Ct. 2292 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wis. Right to Life, Inc.* v. *FEC*,
  546 U.S. 410 (2006) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . iv, 18

## Statutes and Rules

18 U.S.C. § 921(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 922(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

18 U.S.C. § 922(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 922(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

27 C.F.R. § 478.96(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

27 C.F.R. § 478.99 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

D.C. Code § 22-4505(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

D.C. Code § 7-2502.06(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

D.C.M.R. § 24-2320.3(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C.M.R. § 24-2320.3(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Haw. Rev. Stat. § 134-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mich. Comp. Laws § 28.422(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

N.C. Gen. Stat. § 14-402(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## Other Authorities

Allen Rostron, *Justice Breyer's Triumph in the
    Third Battle over the Second Amendment*,
    80 Geo. Wash. L. Rev. 703 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Richard Re, *Narrowing Supreme Court Precedent
    from Below*, 104 Geo. L. J. 921 (2016). . . . . . . . . . . . . . . . . . . . . . 12

## ISSUES PRESENTED

1. Whether the complete national prohibition of all interstate handgun transfers is narrowly tailored to preventing the circumvention of state handgun laws, considering that (a) states and localities often allow interstate handgun sales; (b) states can choose their level of participation in national background check systems; and (c) the federal government provides guidance to federally-licensed firearm dealers regarding the state and local laws with which they are required to comply.

2. The District of Columbia requires handgun consumers to register their purchases with the police prior to taking possession of any new handgun. The District has amended its police regulations to allow for interstate handgun sales. Are District residents, and a Texas retailer who would sell them handguns, barred from challenging the federal interstate handgun transfer ban's application to their transactions, merely because that prohibition is claimed to be facially valid?

## INTRODUCTION

Ten years following the landmark decision in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), there is still no national retail market for handguns. Handguns are apparently the only consumer products whose acquisition is secured by the Bill of Rights, yet which Americans are forbidden from acquiring outside their home state as part of our national common market.

Federal law mandates that consumers wishing to buy a handgun located outside their state of residence must have the selling dealer ship the gun to a dealer in the consumer's state, who then completes the sale. The interstate handgun transfer prohibition limits choice and price competition, and raises the cost of handguns due to additional shipping fees and transfer fees charged by the shipping and receiving dealers.

The prohibition works particular hardship on residents of our nation's capital, which lacks gun stores. While District of Columbia residents can (and do) take delivery of rifles and shotguns from FFLs in the states, handguns must be shipped to the District's sole FFL willing to transfer firearms to consumers. Operating from the city's main police

station, this middleman charges $125 per handgun transfer for his services.

Yet the District of Columbia's famously strict gun control laws render the interstate handgun transfer ban's application to District residents especially suspect. District residents may not acquire any firearm without first registering it with the city's police department. Only upon presentation of a police-approved registration certificate may an FFL release the particular, registered firearm to a consumer. What anti-circumvention interest, then, is served by applying the federal prohibition on interstate handgun transfers against District residents?

The District Court struck down the federal interstate handgun transfer ban as a violation of the Second Amendment and the equal protection components of the Fifth Amendment's Due Process Clause. But a panel of this Court reversed. The panel asserted the application of strict scrutiny, yet its perfunctory approval of the prohibition reflects rational basis review. Equally troubling, the panel held that the prohibition's asserted facial validity precluded consideration of plaintiffs'

as-applied challenge, which by definition, must be considered in relation to the individualized factual circumstances before the Court.

The case should be reheard en banc.

### THE COURSE OF PROCEEDINGS

On July 14, 2014, plaintiffs brought this action in the United States District Court for the Northern District of Texas, seeking declaratory and injunctive relief from the federal interstate handgun transfer ban, 18 U.S.C. § 922(b)(3) and 27 C.F.R. § 478.99. ROA.1, ROA.3.[1] At the government's insistence that Section 922(a)(3) supplies an essential element of this scheme, plaintiffs amended their complaint to target this provision as well. ROA.456.

On February 11, 2015, the District Court denied the government's motion to dismiss or for summary judgment, granted plaintiffs' motion for summary judgment, and entered judgment for plaintiffs. The District Court stuck down the ban under both strict and intermediate scrutiny, on its face and as-applied to plaintiffs. ROA.6, ROA.463-91. It then denied the government's motion to stay the judgment. ROA.517.

_____

[1]All statutory references are to Title 18 of the United States Code unless noted otherwise.

4

A panel of this Court heard argument on January 6, 2016. On January 19, 2018, it reversed. With respect to the Second Amendment, the panel "assume[d], without deciding, that [the challenged provisions] are not 'longstanding regulatory measures' and are not 'presumptively lawful regulatory measures.'" Op. at 6-7 (footnotes omitted). The panel "also assume[d], without deciding, that the strict, rather than intermediate, standard of scrutiny is applicable." Op. at 7.

Purporting to apply strict scrutiny, the panel upheld the law based on what it asserted to be "unrealistic" or "reasonable" for the government to "expect," Op. at 9, 10, and dismissed out-of-hand various narrow-tailoring options. Faced with the fact that the government allows interstate long gun transfers that are lawful in the purchaser's home state, the panel suggested without explanation that these sales, too, could be banned, by asserting that a regulation's underinclusivity is no bar to constitutionality. Op. at 11-12.

Because it concluded that the prohibition is facially valid, the panel dismissed as irrelevant any concerns as to the prohibition's validity as-applied to plaintiffs. Op. at 12.

Turning to the equal protection claim, the panel "[did] not subject [the interstate handgun transfer ban] to any scrutiny—strict or otherwise," because it "does not favor or disfavor residents of any particular state." Op. at 14.

Judge Owen concurred. Although her opinion for the panel did not address the matter, she wrote separately to detail why the government's contention that the challenged provisions are "presumptively lawful" "longstanding prohibitions" is "not well-taken." Op. at 15 (Owen, J., concurring). Judge Owen further discussed why "it is unnecessary to resolve whether strict scrutiny is *required*," *id.* at 20; noted that the government "has not explained how or why" states could not share disqualifying information with out-of-state FFLs, *id.* at 22; and offered further views as to why the government has a heightened regulatory interest with respect to handguns relative to long guns, *id.* at 23.

FACTUAL BACKGROUND

1. *The Regulatory Scheme*

Sections 922(a)(3) and (5) forbid individuals from transporting into or receiving in their state of residence any firearm acquired outside that

state since December 16, 1968, except for firearms acquired by bequest or intestate succession, or pursuant to a transfer from an FFL that complies with Section 922(b)(3). For purposes of these provisions, the District of Columbia is a "state." Section 921(a)(2).

Section 922(b)(3) and 27 C.F.R. § 478.99 bar FFLs from transferring firearms to individuals who do not reside within the state in which the dealers' place of business is located. A significant exception to this prohibition allows FFLs to transfer rifles and shotguns to individuals residing out-of-state, if the transaction occurs in person, and fully complies with the laws of the FFLs' and consumers' states. Section 922(b)(3); *accord* 27 C.F.R. § 478.96(c)(1).

Texas law does not forbid the sale of handguns to people residing outside of Texas.

The District of Columbia requires that "[a]n application for a registration certificate shall be filed (and a registration certificate issued) prior to taking possession of a firearm from a licensed dealer . . . ." D.C. Code § 7-2502.06(a). The District allows a handgun buyer to transport handguns "from the place of purchase to his or her home." D.C. Code §

22-4505(a)(6). The buyer must "[o]btain assistance necessary to complete the [registration] application by presenting the firearm registration application to a firearms dealer licensed under federal law . . . (2) [l]ocated outside the District if the firearm is purchased outside the District." D.C.M.R. § 24-2320.3(b)(2). Following approval, the handgun purchaser must:

> Present the approved firearm registration application to the dealer licensed under federal law or, if federal law such as 18 U.S.C. § 922 prohibits the dealer from delivering the pistol to the applicant because the dealer is not within the District of Columbia, have that firearms dealer transport the pistol to a dealer located within the District, where the applicant will take delivery of the pistol.

D.C.M.R. § 24-2320.3(f). The rule was drafted this way to "clarify" that D.C. does not independently bar interstate handgun transfers. *See* Appellees' Br. at 7-8.

2.   *The Scheme's Application Against Plaintiffs*

Fredric Mance sells handguns pursuant to an FFL in Arlington, Texas. ROA.280. Tracey and Andrew Hanson, a married couple, reside in Washington, D.C. ROA.283, ROA.284, ROA.286, ROA.287. All three are members of the Citizens Committee for the Right to Keep and Bear Arms, a non-profit membership association dedicated to promoting the

8

benefits of the right to bear arms, whose members buy and sell handguns throughout the United States. ROA.289. Some of the Committee's members reside in jurisdictions that do not prohibit purchasing handguns out of state. Some also reside in jurisdictions that require a license or pre-registration to purchase handguns. Some sell handguns in states that do not forbid the sale of handguns to non-residents. ROA.289-90.

Mance would sell handguns directly to consumers residing in other states, and in the District of Columbia, but refrains from doing so because of the federal interstate handgun transfer ban. ROA.280. The Hansons would shop for and buy handguns directly from federally-licensed dealers outside of Washington, D.C., but refrain from doing so because of the federal interstate handgun transfer ban. ROA.283, ROA.286. Because they cannot directly access a national handgun market, the Hansons face loss of choice and higher costs in purchasing handguns, owing to reduced competition, shipping, and transfer fees. There are no federally-licensed firearms retailers in Washington, D.C.

The only licensee willing to effect a transfer charges $125. ROA.283, ROA.284, ROA.286, ROA.287.

The Hansons visited Mance in Texas. They each identified a handgun in Mance's inventory that is legal for them to possess in Washington, D.C., and which they would have purchased from Mance directly were it legal to do so. ROA.281, ROA.284, ROA.287. The three memorialized their intent to engage in those transactions by completing, in each other's presence as required by District of Columbia law, the District of Columbia's PD-219 form. Mance verified that the Hansons' credit card would be valid to complete the purchase, but no money, or firearms, changed hands. ROA.281, ROA.284, ROA.285, ROA.287, ROA.288.

But for the federal interstate handgun transfer ban, the Hansons would directly purchase handguns from dealers outside D.C., including Mance, ROA.285, ROA.288, and Mance would sell handguns to consumers throughout the country, ROA.281. Other Committee members would likewise buy and sell handguns across state lines, but for the interstate handgun transfer ban. ROA.289, ROA.290.

ARGUMENT

## I. IN UPHOLDING THE INFRINGEMENT OF A FUNDAMENTAL RIGHT, THE PANEL ASSERTED, BUT DID NOT APPLY, STRICT SCRUTINY.

Plaintiffs appreciate the panel's acknowledgment that strict scrutiny should govern this case. "A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny." *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012). Abolishing the national retail handgun market should qualify as a threat to core Second Amendment self-defense interests.

But a difference may exist between asserting a standard, and applying it. As Justice Thomas observed, there exists even at the Supreme Court a "tendency to relax purportedly higher standards of review for less-preferred rights." *Whole Woman's Health* v. *Hellerstedt*, 136 S. Ct. 2292, 2328 (2016) (Thomas, J., dissenting) (citations omitted). At least elsewhere, that has long been true of the Second Amendment. Six years have passed since observers could persuasively argue that Justice Breyer's interest-balancing dissent, not *Heller*'s majority's opinion, is

effectively controlling. Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 Geo. Wash. L. Rev. 703 (2012). "[T]he passage of time has seen *Heller*'s legacy shrink to the point that it may soon be regarded as mostly symbolic." Richard Re, *Narrowing Supreme Court Precedent from Below*, 104 Geo. L. J. 921, 962-63 (2016).

Accordingly, this Court should be vigilant in ensuring that Second Amendment rights are enforced in deed as well as word. The panel acknowledged that it is "rare" for laws to survive strict scrutiny. Op. at 7 (footnote omitted). The caution of en banc review is warranted.[2]

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest," *Reed*, 135 S. Ct. at 2231 (internal quotation marks omitted); *Dep't of Tex.*, 760 F.3d at 438, a burden that cannot be met where less restrictive alternatives are available, *Ashcroft*, 542 U.S. at 666.

---

[2]Rehearing is sought for the entire case. The arguments respecting strict scrutiny and as-applied standards are equally valid for plaintiffs' Second and Fifth Amendment claims.

Acknowledging a federal interest in ensuring that state handgun laws are not circumvented, has the government proved that abolishing *all* interstate handgun transfers is a *narrowly tailored* way of advancing that purpose, for which there are no less restrictive means available?

The panel declared that there are many handgun laws, and an FFL cannot be expected to know them all. But courts are skeptical of state residency restrictions based on the concept that the people of one state cannot gain sufficient knowledge of laws or conditions in another state. *Cf. O'Reilly* v. *Bd. of Appeals*, 942 F.2d 281 (4th Cir. 1991) (non-resident taxi driver can prove familiarity with out-of-state geography). Attorneys should be able to research and understand the laws of the various jurisdictions in which they are barred, yet that does not allow states to restrict bar membership to in-state residents. *Supreme Court of New Hampshire* v. *Piper*, 470 U.S. 274, 285 (1985).

Handgun laws are *not* necessarily more complicated than long gun laws, to the point of being unknowable by out-of-state FFLs. Few laws have vexed courts as much as regulations seeking to ban particular rifles as "assault weapons." *See, e.g.*, *Peoples Rights Org.* v. *City of Columbus*,

152 F.3d 522 (6th Cir. 1998) (striking down five definitions of "assault weapon" as unconstitutionally vague); *Springfield Armory* v. *City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994) (rifle "ordinance is fundamentally irrational and impossible to apply consistently by the buying public, the sportsman, the law enforcement officer, the prosecutor or the judge"); *Harrott* v. *County of Kings*, 25 Cal.4th 1138, 1153, 25 P.3d 649, 659 (2001) (adopting saving construction of California Assault Weapons Control Act provisions raising "serious and doubtful constitutional questions as applied to ordinary citizens"). And yet the government trusts Mance to sell long arms to residents of any American jurisdiction.

Indeed, many jurisdictions, including the one at issue, remove all guesswork from handgun transactions by requiring police pre-approval of handgun transfers. D.C. Code § 7-2502.06(a); *see also, e.g.,* Haw. Rev. Stat. § 134-2; Mich. Comp. Laws § 28.422(1); N.C. Gen. Stat. § 14-402(a). As the government allows Mance to honor D.C. rifle registrations, it is illogical for it to bar him from honoring identical handgun registrations.[3]

---

[3]Though not an aspect of plaintiffs' claims, the interstate handgun transfer ban is troubling from a federalism perspective, as it frustrates

And then there is the fact that modern communications and computerized databases wholly enable national access to federal or state background check databases, as the case may be. Federal law has featured national access to the NICS database for some time. States may share disqualifying purchase information as they wish, but a state's unwillingness to participate in a background check system should not justify prohibiting firearm sales to its residents.

The interstate handgun transfer ban ought not withstand strict scrutiny.

## II.   THE PANEL ERRED IN ASSERTING THAT FACIAL VALIDITY PRECLUDES AN AS-APPLIED CHALLENGE.

The panel offered that "[i]n resolving an as-applied challenge, we consider only whether the rule advances government interests in the aggregate and not whether the rule advances government interests in the individual case before us." Op. at 12 (footnote citing *Ward* v. *Rock Against Racism*, 491 U.S. 781, 801 (1989); *United States* v. *Edge Broad. Co.*, 509 U.S. 418, 431 (1993); and *Ohralik* v. *Ohio State Bar Ass'n*, 436 U.S. 447, 463-64 (1978)). Applying this asserted standard, and without

state efforts to enhance handgun access.

any discussion, the panel summarily offered that "[w]e cannot look only to Texas or District of Columbia law; we must ask whether the federal regulation advances the Government's interests in the aggregate. It does. The in-state sales requirement is not unconstitutional as applied to Mance and the Hansons." Op. at 13.

This is not an as-applied analysis.

This is merely a repetition of the (erroneous) decision with respect to plaintiffs' facial challenge. In *any* case of facial validity, by definition, "the rule advances government interests in the aggregate." But if that is all that is required to dispense with an as-applied challenge, there is no such thing as an as-applied challenge.

The panel over-read its cited precedent. First, *Ward* was not an as-applied case. Rather, it upheld a time, place and manner regulation as against a facial challenge. *See Ward*, 491 U.S. at 788 ("respondent amended its complaint to seek damages and a declaratory judgment striking down the guidelines as facially invalid"); *id.* at 790 ("because the ordinance is valid on its face, we now reverse"). *Edge* and *Ohralik* concerned as-applied challenges, but in this regard stand merely for the

proposition that the government need not prove that a rule's application to a challenger in a given circumstance actually prevented harm. That does not mean that the challenger's circumstances are irrelevant. The panel's quoted portions of *Edge* and *Ohralik*, Op. at 13 n.52, provide as much, and effectively refute the conclusion to which they are attached. "[T]he as-applied inquiry focuses on the 'general circumstances' of a litigant's acts and does not require proof that 'the state interests supporting the rule actually were advanced by applying the rule' in the litigant's case" *Id.* (quoting *Edge Broad.*, 509 U.S. at 431). *Ohralik* "reject[ed] the argument that 'nothing less than actual proved harm to the solicited individual would be a sufficiently important state interest to justify" applying the rule. *Id.* (quoting *Ohralik*, 436 U.S. at 463-64).

The "general circumstances" of this as-applied challenge is the selling of handguns to D.C. residents by a Texas FFL. Of course the government need not prove that barring this sale averts the circumvention of D.C. law. But the government does bear the burden of proving that its prohibition, applied to these general circumstances, satisfies strict scrutiny. The panel erred in relieving the government of this obligation,

17

and it did so in contravention of established doctrine defining what an as-applied challenge actually does.

The claim that facial validity precludes an as-applied challenge is erroneous. "In upholding [a statute] against a facial challenge, we [do] not purport to resolve future as-applied challenges." *Wis. Right to Life*, 546 U.S. at 411-12. Citing this basic rule, this Court sitting en banc announced that "it is well-established that the facial upholding of a law does not prevent future as-applied challenges." *Cao*, 619 F.3d at 430. Whether an as-applied challenge can be brought depends on whether it rests upon a "sufficiently developed factual record," rather than on established "general principles." *Id.* The concept works in reverse as well. "Courts routinely adjudicate as-applied constitutional challenges to statutes; these decisions do not become facial challenges simply because of their *stare decisis* effect in future cases presenting similar facts or legal theories." *Exelon Wind*, 766 F.3d at 391 (citing *Cao*).

> A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to *a particular person* under *particular circumstances* deprived *that person* of a constitutional right.

18

*United States* v. *Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citations

omitted) (emphases added). As-applied challenges do not threaten facial

validity, which requires only a "plainly legitimate sweep." *Wash. State*

*Grange* v. *Wash. State Republican Party*, 552 U.S. 442, 450 (2008).

The panel should not have dismissed plaintiffs' as-applied challenge

simply because it believed that the interstate handgun transfer ban is

facially valid. Left undisturbed, such precedent could erroneously

frustrate as-applied constitutional challenges of every description.

With respect to the case at hand, the District Court correctly decided

the matter. There is no great mystery as to how the District of

Columbia's gun registration system works. Anyone basically capable of

operating a business, including a highly-regulated business such as one

dealing in firearms, can grasp that D.C. residents may not take

possession of a particular firearm until they have been authorized to do

so by the District's Police Chief. A firearms dealer presented with an

official D.C. Metropolitan Police Department firearm registration

certificate, issued to a particular individual for a particular firearm, can

rest assured that no D.C. law would be violated by the transfer of that

firearm to that individual. Any doubts as to the validity of that certificate can be resolved with a simple telephone call. Under these circumstances, the government lacks any interest in blocking the exercise of a fundamental right. Nor would suppressing the right fit any legitimate anti-circumvention interest.

CONCLUSION

Rehearing en banc should be granted.

Dated:   March 19, 2018                    Respectfully submitted,

                                           /s/ Alan Gura
                                           Alan Gura
William B. Mateja                            Counsel of Record
POLSINELLI P.C.                            GURA PLLC
2950 N. Harwood, Suite 2100                916 Prince Street, Suite 107
Dallas, TX 75201                           Alexandria, VA 22314
214.397.0030/Fax 214.397.0033              703.835.9085/Fax 703.997.7665

Counsel for Appellees

20

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This document complies with the word limit of Fed. R. App. P.
   35(b)(2)(A) because, excluding the parts of the documented
   exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, this
   document contains 3,897 words. This word count includes the
   Statement required by Fed. R. App. P. 35(b)(1).

2. This document complies with the typeface requirements of Fed. R.
   App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
   32(a)(6) because this document has been prepared in a
   proportionately spaced typeface using WordPerfect X5 in 14 point
   Century Schoolbook font.

           /s/ Alan Gura
           Alan Gura
           Attorney for Plaintiffs-Appellees
           Dated: March 19, 2018

CERTIFICATE OF SERVICE

On March 19, 2018, I electronically filed the attached Petition for Rehearing En Banc with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


Dated: March 19, 2018        /s/ Alan Gura
                                               Alan Gura

APPENDIX

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-10311

United States Court of Appeals
Fifth Circuit

**FILED**

January 19, 2018

Lyle W. Cayce
Clerk

FREDRIC RUSSELL MANCE, JR.; TRACEY AMBEAU HANSON; ANDREW HANSON; CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS,

        Plaintiffs–Appellees,

v.

JEFFERSON B. SESSIONS, III, U. S. ATTORNEY GENERAL; THOMAS E. BRANDON, Acting Director, Bureau of Alcohol, Tobacco, Firearms and Explosives,

        Defendants–Appellants.

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before PRADO, OWEN, and HAYNES, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Federal laws that include 18 U.S.C. §§ 922(a)(3) and 922(b)(3), and 27 C.F.R. § 478.99(a), generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located. In a suit brought by Fredric Russell Mance, Jr. and others, the federal district court enjoined the enforcement of these laws, concluding that they violate the Second Amendment and the Due Process

No. 15-10311

Clause of the Fifth Amendment.[1] We reverse the district court's judgment and vacate the injunction.

# I

Andrew and Tracy Hanson, who are residents of the District of Columbia and members of the Citizens Committee for the Right to Keep and Bear Arms (the Committee), travelled to Texas desiring to purchase two handguns from Mance, an FFL in Arlington, Texas, who is also a member of the Committee. It is undisputed that the Hansons would be eligible under the laws of Texas and the District of Columbia to own and possess the handguns that they selected from Mance's inventory. However, federal law prevents Mance from selling a handgun directly to the Hansons since they are not residents of Texas. Federal law would have permitted Mance to transfer the handguns to the FFL in the District of Columbia so that the Hanson's could purchase the firearms from that FFL. The federal laws do not impose or even allude to a fee if such a transfer occurs, but the FFL in the District of Columbia would have charged the Hansons a transfer fee of $125 for each handgun, above and beyond the purchase price. The Hansons declined to pursue this method of obtaining the firearms because they objected to the additional fees and to shipping charges. They could not purchase the handguns of their choosing from the sole FFL in the District of Columbia because that dealer has no inventory and only sells firearms transferred from FFLs outside of the District.

Mance, the Hansons, and the Committee initiated suit in Texas challenging the federal laws that restrict the sale of handguns by an FFL to residents of the state in which the FFL is located, asserting that the federal laws contravene the Second and Fifth Amendments. The plaintiffs sought an injunction prohibiting the enforcement of these laws. The district court denied

---

[1] *Mance v. Holder*, 74 F. Supp.3d 795, 813-14 (N.D. Tex. 2015).

No. 15-10311

the Government's Motion to Dismiss for Lack of Standing, granted the plaintiffs' motion for summary judgment, and denied the Government's competing motion for summary judgment. The district court enjoined the enforcement of the challenged laws, concluding that they violated both the Second Amendment and the equal protection component of the Fifth Amendment's Due Process Clause. The Government has appealed.

## II

Because the Hansons are not Texas residents, Mance, a Texas FFL, cannot lawfully sell handguns to them. Such a transaction is prohibited by 18 U.S.C. § 922(a)(3) and (b)(3), which provides:

> (a) It shall be unlawful— . . .

> (3) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter . . . .

> * * *

> (b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver— . . .

> (3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is

No. 15-10311

located, except that this paragraph (A) shall not apply to the sale
or delivery of any rifle or shotgun to a resident of a State other
than a State in which the licensee's place of business is located if
the transferee meets in person with the transferor to accomplish
the transfer, and the sale, delivery, and receipt fully comply with
the legal conditions of sale in both such States (and any licensed
manufacturer, importer or dealer shall be presumed, for purposes
of this subparagraph, in the absence of evidence to the contrary, to
have had actual knowledge of the State laws and published
ordinances of both States), and (B) shall not apply to the loan or
rental of a firearm to any person for temporary use for lawful
sporting purposes . . . .[2]

Regulations promulgated to implement these prohibitions are set forth

in 27 C.F.R. § 478.99(a), which provides:

(a) Interstate sales or deliveries. A licensed importer,
licensed manufacturer, licensed dealer, or licensed collector shall
not sell or deliver any firearm to any person not licensed under this
part and who the licensee knows or has reasonable cause to believe
does not reside in (or if a corporation or other business entity, does
not maintain a place of business in) the State in which the
licensee's place of business or activity is located: *Provided*, That
the foregoing provisions of this paragraph (1) shall not apply to the
sale or delivery of a rifle or shotgun (curio or relic, in the case of a
licensed collector) to a resident of a State other than the State in
which the licensee's place of business or collection premises is
located if the requirements of § 478.96(c) are fully met, and
(2) shall not apply to the loan or rental of a firearm to any person
for temporary use for lawful sporting purposes (see § 478.97).[3]

The question is whether these federal laws violate the Second Amendment.

## III

The Second Amendment provides: "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and

bear Arms, shall not be infringed."[4]  The United States Supreme Court held in

---

[2] 18 U.S.C. § 922(a)(3), (b)(3).

[3] 27 C.F.R. § 478.99.

[4] U.S. CONST. amend. II.

No. 15-10311

*District of Columbia v. Heller* that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."[5] After extensive analysis of the historical context of the Second Amendment, the Court concluded "that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right" to keep and bear arms.[6] The Court reasoned that "self-defense . . . was the *central component* of the right itself."[7] With regard to handguns, the Court observed that, "the American people have considered the handgun to be the quintessential self-defense weapon."[8] In contemplating why a citizen might prefer a handgun over long guns for home defense, the Court held, "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."[9]

The Supreme Court has recognized, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."[10] The Court explained in *Heller* that:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[11]

The Court added: "We identify these presumptively lawful regulatory

---

[5] 554 U.S. 570, 592 (2008)

[6] *Id.* (emphasis in original).

[7] *Id.* at 599 (emphasis in original).

[8] *Id.* at 629.

[9] *Id.*

[10] *Id.* at 626.

[11] *Id.* at 626-27; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools

5

No. 15-10311

measures only as examples; our list does not purport to be exhaustive."[12]

In *National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, our court was called upon to apply *Heller* in determining whether federal statutes[13] that prohibit FFLs from selling handguns to a person under the age of 21 were constitutional in light of the Second Amendment.[14] We first canvased the analytical frameworks that other Circuit Courts of Appeals had utilized in Second Amendment cases, identified "[a] two-step inquiry" employed by some of those courts, and "adopt[ed] a version of this two-step approach."[15] We concluded "that the first inquiry is whether the conduct at issue falls within the scope of the Second Amendment right."[16] That undertaking, we said, entails "look[ing] to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee."[17]

The district court in the present case undertook such an analysis and determined that "the earliest known state residency restrictions on the purchase or possession of firearms" occurred in 1909.[18] The district court concluded that "these early twentieth century state residency restrictions do not date back quite far enough to be considered longstanding."[19] Because we conclude that the laws and regulations at issue withstand strict scrutiny, we will assume, without deciding, that they are not "longstanding regulatory

---

and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here." (citation omitted)).

[12] *Heller*, 554 U.S. at 627 n.26.

[13] 18 U.S.C. § 922(b)(1) and (c)(1).

[14] 700 F.3d 185, 192 (5th Cir. 2012).

[15] *Id.* at 194.

[16] *Id.*

[17] *Id.*

[18] *Mance v. Holder*, 74 F. Supp.3d 795, 805 (N.D. Tex. 2015).

[19] *Id.*

No. 15-10311

measures"[20] and are not "presumptively lawful regulatory measures."[21]  We will also assume, without deciding, that the strict, rather than intermediate, standard of scrutiny is applicable.

## IV

The Supreme Court has said in the First Amendment context that to withstand strict scrutiny, a regulation must be "justified by a compelling government interest" and must be "narrowly drawn to serve that interest."[22] When strict scrutiny is applicable, the Government "must specifically identify an 'actual problem' in need of solving," and the "curtailment of [the constitutional right] must be actually necessary to the solution."[23]  Though this is "a demanding standard," and "'[i]t is rare that a regulation restricting speech because of its content will ever be permissible,'"[24] the Supreme Court has observed that "those cases do arise,"[25] and has said that "we wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.'"[26]

The district court accepted that when Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968[27] and the Gun Control Act of 1968,[28] there was an actual problem in need of solving.[29]  The findings and declarations set forth in the Crime Control Act reflect that Congress was of the view that "the existing Federal controls over [widespread traffic in firearms] do not adequately enable the States to control this traffic within their own

---

[20] *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion).

[21] *Dist. of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008).

[22] *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011).

[23] *Id.* (quoting *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 822 (2000)).

[24] *Id.* (quoting *Playboy*, 529 U.S. at 818).

[25] *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1666 (2015).

[26] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 519 (1980) (MARSHALL, J., concurring in the judgment)).

[27] Pub. L. No. 90-351, 82 Stat. 197 (1968).

[28] Pub. L. No. 90-618, 82 Stat. 1213 (1968).

[29] *See Mance v. Holder*, 74 F. Supp.3d 795, 808-09 (N.D. Tex. 2015). ("First, the Court agrees the Government's interest in preventing handgun crime is a compelling interest.").

No. 15-10311

borders through the exercise of their police power."[30]  Congress had concluded that there was a "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State," and these interstate purchases were accomplished "without the knowledge of . . . local authorities."[31]   Congress found that individuals circumventing the laws of the state in which they resided included "large numbers of criminals and juveniles."[32]  Congress had additionally concluded "that the acquisition on a mail-order basis of firearms other than a rifle or shotgun by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances . . . ."[33]  Similarly, Congress found:

> that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensees' places of business are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms . . . .[34]

The solution Congress crafted included the in-state sales requirement.

However, current burdens on constitutional rights "must be justified by current needs."[35]  The overarching question in a strict-scrutiny analysis of the

---

[30] Crime Control Act § 901(a)(1), 82 Stat. at 225 (1968).

[31] S. Rep. No. 89-1866 (1966), at 19.

[32] S. Rep. No. 90-1097 (1968), at 80; *see also* Crime Control Act § 901(a)(2), 82 Stat. at 225 (1968) ("The Congress hereby finds and declares . . . that the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles without the knowledge or consent of their parents or guardians; narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States . . . .").

[33] Crime Control Act § 901(a)(4), 82 Stat. at 225 (1968).

[34] *Id.* § 901(a)(5), 82 Stat. at 225 (1968).

[35] *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013) (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)).

No. 15-10311

laws and regulations at issue, it seems to us, is whether an in-state sales requirement remains justified by a compelling government interest and is narrowly drawn to serve that interest after the Gun Control Act was amended by the Brady Act[36] and in light of federal regulations promulgated after the in-state sales requirement was enacted.[37]

All concede that there is a compelling government interest in preventing circumvention of the handgun laws of various states. The plaintiffs recognize that current federal laws, including the Brady Act, do not require all information regarding compliance with the various state and local gun control laws to be included in databases accessible by FFLs nationwide. The plaintiffs maintain, however, that the in-state sales requirement is not narrowly tailored because the states could be compelled by federal law to provide all necessary information. We conclude that the Government has demonstrated that the in-state sales requirement is narrowly tailored, notwithstanding the information that is available or could, at least theoretically be made available, to all FFLs under federal laws and regulations.

There are more than 123,000 FFLs nationwide.[38] It is unrealistic to expect that each of them can become, and remain, knowledgeable about the handgun laws of the 50 states and the District of Columbia, and the local laws within the 50 states. The district court relied on 27 C.F.R. § 478.24[39] to support

---

[36] Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993).

[37] *See* 27 C.F.R. § 478.24.

[38] U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GENERAL EVALUATION AND INSPECTIONS DIVISION, REVIEW OF ATF'S FEDERAL FIREARMS LICENSEE INSPECTION PROGRAM at i (2013), *available at* https://oig.justice.gov/reports/2013/e1305.pdf.

[39] The text of 27 C.F.R. § 478.24 provides:

(a) The Director shall annually revise and furnish Federal firearms licensees with a compilation of State laws and published ordinances which are relevant to the enforcement of this part. The Director annually revises the compilation and publishes it as "State Laws and Published Ordinances—

9

No. 15-10311

the conclusion that FFLs can "ensure that their firearms transactions comport with state and local law."[40]   But the compilation of state gun laws by the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives is more than 500 pages long, and it provides the full text of those laws.[41]   FFLs are not engaged in the practice of law, and we do not expect even an attorney in one state to master of the laws of 49 other states in a particular area.  Additionally, the compilation on which the district court relied is only updated annually.[42]

The laws of the various states differ as to who may lawfully possess a firearm.  All but one state (Vermont) prohibits possession of a firearm by a felon, but the definitions of "felony" differ.  Similarly, restrictions based on mental illness vary.  Some states prohibit the purchase of a firearm by drug abusers,[43] and some restrict purchases by those who have abused alcohol.[44]

It is reasonable, however, for the federal government to expect that an FFL located in a state can master and remain current on the firearm laws of

---

Firearms" which is furnished free of charge to licensees under this part. Where the compilation has previously been furnished to licensees, the Director need only furnish amendments of the relevant laws and ordinances to such licensees.

(b) "State Laws and Published Ordinances—Firearms" is incorporated by reference in this part. It is ATF Publication 5300.5, revised yearly. The current edition is available from the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402. It is also available for inspection at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ ibr_locations.html. This incorporation by reference was approved by the Director of the Federal Register.

[40] *Mance v. Holder*, 74 F. Supp.3d 795, 810 n.11 (N.D. Tex. 2015).

[41] *See generally State Laws and Published Ordinances - Firearms* (32nd Edition), BUREAU OF ALCOHOL, TOBACCO, FIREARMS, & EXPLOSIVES (Nov. 22, 2017), https://www.atf. gov/firearms/state-laws-and-published-ordinances-firearms-32nd-edition [https://perma.cc/ KNU2-FYHS] (last visited Nov. 29, 2017).

[42] *See* 27 C.F.R. § 478.24(a).

[43] *See, e.g.*, MD. CODE ANN., Pub. Safety §§ 5-133(b)(5); MO. REV. STAT. § 571.010.

[44] *See, e.g.*, MD. CODE ANN., Pub. Safety §§ 5-133(b)(4); TENN. CODE § 39-17-1316.

No. 15-10311

that state. The in-state sales requirement is narrowly tailored to assure that an FFL who actually makes a sale of a handgun to someone other than another FFL can reasonably be expected to know and comply with the laws of the state in which the sale occurs.

The plaintiffs recognize that the Government has an interest in preventing circumvention of the states' varying firearms laws, but they assert that federal law could require all FFLs to comply with the guns laws of the state in which a buyer of a handgun resides, just as federal law requires FFLs to comply with state and local laws throughout the United States when selling long arms.[45] They assert, "[i]f Mance can follow an out-of-state rifle law, he can follow an out-of-state handgun law."

However, at least some states have regulated the sale of handguns more extensively than they have regulated the sale of long guns. For example, the Government has identified state laws that require a mandatory waiting period for the purchase of handguns, but not for long guns,[46] and state laws that limit the number of handgun purchases, but not long gun purchases, to one per month.[47]

But there is another reason that the plaintiffs' reliance on the disparate treatment federal law accords handguns and long guns does not carry the day. In the First Amendment context, the Supreme Court has recognized in

---

[45] *See* 18 U.S.C. § 922(b)(3)(A) (providing that an FFL may sell or deliver "any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States) . . .").

[46] *See, e.g.*, FLA. CONST. art. I, § 8(b); FLA. STAT. § 790.0655(1); MD. CODE ANN., Pub. Safety §§ 5-101(p), 5-123; WIS. STAT. § 175.35(2)(d).

[47] *See, e.g.*, CAL. PENAL CODE §§ 27535, 27540(f); MD. CODE ANN., Pub. Safety §§ 5-128(b), 5-129; N.J. STAT. ANN. §§ 2C:58-2(a)(7), 2C:58-3(i), 2C:58-3.4.

No. 15-10311

response to an "underinclusivity" argument that "[a] State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns."[48]   The Court observed, "[w]e have accordingly upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests."[49]  In *Williams-Yulee v. Florida Bar*, the Court held that a Florida statute prohibiting judges and judicial candidates from personally soliciting campaign funds[50] survived strict scrutiny even though Florida law permitted "a judge's campaign committee to solicit money, which arguably reduces public confidence in the integrity of the judiciary just as much as a judge's personal solicitation."[51]

With regard to the contention that the in-state sales requirement is unconstitutional as applied to Mance and the Hansons, the plaintiffs assert that the District of Columbia requires police pre-approval of any handgun transfer, citing D.C. Code § 7-2502.06(a), so that an FFL in another state would not have to become acquainted with District of Columbia laws because it could rely on a permit issued by police in the District of Columbia.  The obvious flaw in this argument is that an FFL in a state would have to ascertain that all that was required under the laws of the District of Columbia was such a permit. There is no logical basis for requiring FFLs across the country to know the gun laws of the District of Columbia but not the laws of the 50 States.

In resolving an as-applied challenge, we consider only whether the rule advances government interests in the aggregate and not whether the rule advances government interests in the individual case before us.[52]  The "overall

---

[48] *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1668 (2015).

[49] *Id.*

[50] *Id.* at 1663.

[51] *Id.* at 1668.

[52] *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989) (holding that the validity of a provision challenged on an as-applied basis "depends on the relation it bears to

No. 15-10311

problem the government seeks to correct" with the in-state sales requirement is the circumvention of the laws of a state in which a person desiring to obtain a handgun resides that impose restrictions more stringent than those of some other states.[53]  We cannot look only to Texas or District of Columbia law; we must ask whether the federal regulation advances the Government's interests in the aggregate.    It does.    The in-state sales requirement is not unconstitutional as applied to Mance and the Hansons.

## V

The district court held that the in-state sales requirement violated the equal protection guarantee in the Due Process clause of the Fifth Amendment. The court reasoned that "the federal law not only creates a discriminatory regime based on residency, but it also involves access to the constitutional guarantee to keep and bear arms."[54]

To succeed on an equal protection claim under the Due Process Clause of the Fifth Amendment, a plaintiff is required to "show that two or more classifications of similarly situated persons [are] treated differently."[55]  If we determine that the classification "impermissibly interferes with the exercise of a fundamental right or operates to the peculiar advantage of a suspect class,"

---

the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case"); *United States v. Edge Broad. Co.*, 509 U.S. 418, 431 (1993) (noting that the as-applied inquiry focuses on the "general circumstances" of a litigant's acts and does not require proof that "the state interests supporting the rule actually were advanced by applying the rule" in the litigant's case); *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 463-64 (1978) (rejecting an as-applied challenge to a state law regulating solicitation by attorneys and rejecting the argument that "nothing less than actual proved harm to the solicited individual would be a sufficiently important state interest to justify disciplining the attorney who solicits employment in person for pecuniary gain").

[53] *See* Crime Control Act § 901(a)(5), 82 Stat. at 225 (1968) ("The Congress hereby finds and declares . . . that the sale or other disposition of concealable weapons . . . to nonresidents . . . has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions.").

[54] *Mance v. Holder*, 74 F. Supp.3d 795, 814 (N.D. Tex. 2015) (emphasis omitted).

[55] *Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012) (per curiam).

No. 15-10311

we subject the classification to strict scrutiny.[56]  Otherwise, we will uphold the classification if it is "rationally related to a legitimate state interest."[57]

The in-state sales requirement does not discriminate based on residency. So we do not subject it to any scrutiny—strict or otherwise—under the equal protection component of the Due Process Clause.  The cases on which the district court relied in concluding that the federal laws at issue "impinge[] on residency"[58] involved *state* laws that granted benefits to state residents.[59]  The in-state sales requirement does not favor or disfavor residents of any particular state. Rather, it imposes the same restrictions on sellers and purchasers of firearms in each state and the District of Columbia.

\*        \*        \*

We REVERSE the district court's judgment and VACATE the order granting injunctive relief.

---

[56] *NRA v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 211-212 (5th Cir. 2012) (quoting *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (per curiam)).

[57] *Id.* at 212.

[58] *Mance*, 74 F. Supp.3d at 814.

[59] *See id.* (citing *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 899 (1986) (holding unconstitutional a preference in state civil service employment opportunities for veterans who were residents when they entered military service); *Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 254-64 (1974) (holding unconstitutional a state law establishing in-state residency of a fixed duration as a prerequisite to receiving free, non-emergency medical care)).

14

No. 15-10311

PRISCILLA R. OWEN, Circuit Judge, concurring:

I write separately to provide additional context and explication.

# I

The Government contends that the laws and regulations under consideration are "presumptively lawful" because they are "longstanding prohibitions" that impose "conditions and qualifications on the commercial sale of arms," within the contemplation of the Supreme Court's decision in *District of Columbia v. Heller*.[1] This argument is not well-taken.

The Government asserts that between 1909 and 1939, at least fifteen states had enacted laws restricting the acquisition, or carrying of one or more types of firearms to state residents.[2] The Government contends that evidence of "founding-era thinking" is not required. This court said in *National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives* (*NRA*), that "a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."[3] In that case, our court nevertheless extensively considered founding-era "[a]ttitudes" regarding gun laws and regulations.[4] This court observed in *NRA* that "[s]cholars have proposed that at the time of the founding," there was an implication that only "'the virtuous citizen'" had the right to possess and use arms and that criminals, children and the mentally ill were "'deemed incapable of virtue,'"[5] which was relevant to whether the federal law at issue in that case, prohibiting

---

[1] 554 U.S. 570, 626-27, 627 n.26 (2012).

[2] *See infra* note 15.

[3] 700 F.3d 185, 196 (5th Cir. 2012).

[4] *Id.* at 200-202.

[5] *Id.* at 201 (quoting Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339, 1359-60 (2009)).

No. 15-10311

the sale of a handgun to someone under the age of 21, was constitutional.

More importantly, in *Heller*, the Supreme Court exhaustively canvassed laws extant at the time of, and predating, the Bill of Rights in determining the meaning of the Second Amendment,[6] though it also considered pre-Civil War commentators and case law,[7] post-Civil War legislation,[8] post-Civil War commentators,[9] and a limited analysis of some of the restrictions recognized in an era spanning from "Blackstone through the 19th Century."[10]    The Government asserts that in *Heller*, the Supreme Court described "prohibitions on the possession of firearms by felons" as "longstanding prohibitions" that are "presumptively lawful,"[11] though the District of Columbia Circuit subsequently concluded that "states did not start to enact [prohibitions on the possession of firearms by felons to which the Supreme Court referred in *Heller*] until the early 20th century."[12]    But, as this court recognized in *NRA*, there are indications that in the founding era, it was generally thought that felons and the mentally ill should and could be prohibited from bearing arms.[13]

In the present case, the Government has offered no evidence that an in-state sales requirement has a founding-era analogue or was historically understood to be within the ambit of the permissible regulation of commercial sales of firearms at the time the Bill of Rights was ratified.  However, even if it is appropriate to consider only 20th century laws, an in-state sales

---

[6] *Dist. of Columbia v. Heller*, 554 U.S. 570, 580-605 (2008).

[7] *Id.* at 605-614.

[8] *Id.* at 614-616.

[9] *Id.* at 616-619.

[10] *Id.* at 626-628; *see also id.* at 626 (citing THE AMERICAN STUDENTS' BLACKSTONE 84 n. 11 (G. Chase ed. 1884)).

[11] *Id.* at 626-27, 627 n.26.

[12] *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011).

[13] *Nat'l Rifle Assoc. of Amer., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 200-202 (5th Cir. 2012).

No. 15-10311

requirement was not a "historical tradition"[14] or commonly found in the laws of the United States in that era.

The Government has identified sixteen statutes in fifteen states dating from the early 20th century regarding the licensing or permitting of firearms or the carrying of concealed firearms.[15]  But none of these laws prohibited a citizen of a state from purchasing a firearm, or a specific type of firearm, in another state.  The only state law cited by the Government that addresses the purchase of a firearm in another state is a 1918 Montana statute that prohibits the purchase, borrowing, or other acquisition of a firearm outside of that state without first obtaining a permit in the county of the purchaser's or acquirer's residence.[16]  Even that state law permitted a resident to purchase a firearm, including a handgun, in another state.

We acknowledged in *NRA* that courts "may rely on a wide array of interpretive materials to conduct a historical analysis,"[17] but in the present case, the Government has offered no evidence from interpretive materials that

---

[14] *Heller*, 554 U.S. at 627.

[15] Act of Apr. 6, 1936, No. 82, §§ 1, 5, 7, 1936 ALA. LAWS 51, 51-52, *amended by* Act of Mar. 2, 1937, No. 190, § 1, 1937 ALA. LAWS 223, 223 (Alabama in 1937); Act of March 19, 1923 §§ 1, 3, 1923 ARK. ACTS 379, 379-80 (Arkansas in 1923); Act of Aug. 12, 1910, No. 432, 1910 GA. LAWS 134 (Georgia in 1910); Act of July 11, 1919, § 4, 1919 ILL. LAWS 431, 432 (Illinois in 1919); Act of Feb. 21, 1935, ch. 63, §§ 1, 3, 5, 1935 IND. LAWS 159, 159-61 (Indiana in 1935); Act of Feb. 25, 1939, ch. 14, 1939 ME. ACTS 53 (Maine in 1939); Act of May 29, 1922, ch. 485, § 9, 1922 MASS. ACTS 560, 563 (Massachusetts in 1922); Act of June 2, 1927, ch. 372, §§ 2, 6, 1927 MICH. ACTS 887, 887-89 (Michigan in 1927); Act of April 7, 1921, § 2, 1921 MO. LAWS 692 (Missouri in 1921); Act of Feb. 20, 1918, ch. 2, §§ 1-3, 8, 1918 MONT. LAWS 6, 6-9 (Montana in 1918); Act of March 3, 1919, ch. 74, § 5, 1919 MONT. ACTS 147, 148 (Montana in 1919); Act of March 11, 1924, ch. 137, §§ 1-2, 1924 N.J. ACTS 305, 305-06 (New Jersey in 1924); Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. LAWS 1627, 1628-29 (New York in 1913); Act of March 10, 1919, ch. 197, §§ 1-2, 1919 N.C. LAWS 397, 397-98 (North Carolina in 1919); Act of Feb. 26, 1913, ch. 256, § 1, 1913 OR. LAWS 497 (Oregon in 1913); Act of May 2, 1910, ch. 591, § 1, 1910 R.I. ACTS 156, 156-57 (Rhode Island in 1910); Act of Feb. 16, 1909, ch. 51, 1909 W. VA. ACTS 394, 395-96 (West Virginia in 1909).

[16] *See* Act of Feb. 20, 1918, ch. 2, § 3, 1918 MONT. LAWS at 6-9.

[17] *NRA*, 700 F.3d at 194.

No. 15-10311

an in-state sales requirement was considered lawful under the Second Amendment as that amendment has historically been understood. In the absence of such authority, the in-state sales requirement is not among the "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms"[18] that presumptively do not violate the Second Amendment.

## II

Whether the in-state sales requirement has a rational basis is not the correct standard by which to measure its constitutionality. The Supreme Court made clear in *Heller* that rational basis scrutiny is inappropriate when evaluating the constitutionality of laws that impose conditions or qualifications on the right to keep and bear arms.[19] The Court reasoned that "rational-basis scrutiny is a mode of analysis we have used when evaluating laws under constitutional commands that are themselves prohibitions on irrational laws."[20] The Court concluded that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."[21] The *Heller* decision recognized that the regulation at issue was as a "handgun ban [that] amounts to a prohibition of an entire class of 'arms,'"[22] and that the law "fail[ed] constitutional muster" under both the strict and intermediate standards of

---

[18] *Heller*, 554 U.S. at 626-27.
[19] *Id.* at 628 n.27.
[20] *Id.*
[21] *Id.*
[22] *Id.* at 628.

No. 15-10311

scrutiny.[23]

The Government contends that intermediate scrutiny, rather than strict scrutiny, applies in analyzing the in-state sales requirement because, unlike the regulation at issue in *Heller*, it is not a "ban" on the sale of handguns.[24] In *NRA*, we "reject[ed] the contention that every regulation impinging upon the Second Amendment right must trigger strict scrutiny" and held that the "properly tuned level of scrutiny . . . is [that which is] proportionate to the severity of the burden."[25] We also suggested that "a regulation that does not encroach on the core of the Second Amendment" may be subject only to intermediate scrutiny.[26] Conceivably, a restriction on the commercial sale of a handgun could impinge on the right to possess and bear arms to such an extent that, though not an absolute "ban" on the possession or use of a handgun, strict scrutiny would be applicable. The Government is correct that the in-state sales requirement is not a total prohibition on handgun possession and use. The in-state sales requirement does not prohibit residents of the District of Columbia from purchasing a handgun in the District or a resident of a state from buying a handgun in that state.

In assessing the impact of the federal restrictions upon the Hansons and Mance, it must be recognized that it is the *District's* restrictions that have led the lone FFL in the District to sell only handguns that are transferred from an FFL in one of the states. The fact that no handguns are available for direct

---

[23] *Id.* at 628-29 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family' . . . would fail constitutional muster." (quoting *Parker v. Dist. of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007))).

[24] *Id.* at 628.

[25] *Nat'l Rifle Assoc. of Amer., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 198 (5th Cir. 2012).

[26] *Id.* at 195.

No. 15-10311

purchase in the District is not a result of the in-state sales requirement or any other federal law or regulation. Nor do the federal laws set or require the imposition of a transfer fee by an FFL.

The in-state sales requirement does not prevent a resident of a state or the District of Columbia from using a handgun "in defense of hearth and home."[27] Once lawfully acquired, a handgun may be used and possessed as a defensive weapon where the owner of the handgun resides.

Nevertheless, because the Supreme Court held that the law at issue in *Heller* was unconstitutional under both strict and intermediate scrutiny, it is prudent first to apply strict scrutiny to the in-state sales requirement. Since the panel concludes that the in-state sales requirement satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*.

## III

The district court's reasoning is thoughtful, and it is correct in many respects. The district court correctly recognized that "[t]he principal purpose in enacting the 1968 Gun Control Act was to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them,'"[28] and that "Congress intended to accomplish this" by precluding the crossing of a state line to purchase a handgun.[29] The district court recognized that in 1968, "an instant electronic background check system did not exist," but that the Gun Control Act was subsequently amended by the Brady Act.[30] The district court

---

[27] *Heller*, 554 U.S. at 635.

[28] *Mance v. Holder*, 74 F. Supp.3d 795, 809 (N.D. Tex. 2015) (quoting *Huddleston v. United States*, 415 U.S. 814, 824 (1974)).

[29] *Id.*

[30] *Id.* (citing Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993)).

No. 15-10311

found that as a result, "before an FFL may sell or deliver a firearm to a non-FFL, he must complete a criminal background check through the National Instant Criminal Background Check System ('NICS') to ensure the purchaser is legally entitled to obtain and possess the firearm"[31] and that "States may also create a Point of Contact ('POC'), who acts as a liaison to NICS, to run the background check and receive notice of anticipated firearms purchases by its citizens."[32]

The district court concluded that this system "ensures potential purchasers can legally acquire and possess a firearm under state and federal law, and those states that desire to receive notice of firearms purchased by its citizens simply establish a POC,"[33] and that these checks "identify both federal and state disabilities" in would-be purchasers.[34] This conclusion is not entirely supported by the record.

The Government presented evidence that the federal background check system does not reflect whether a person seeking to purchase a handgun has satisfied state requirements that may include training and special permits and does not reflect whether a particular type of firearm is legal in a particular state. The Government also noted that states may require additional procedures and a mandatory waiting period before a transaction may occur and that this information regarding a particular individual is not available in the databases.

But not all of the Government's arguments are well-taken. In contending that in-state background checks are superior to those conducted by

---

[31] *Id.* (citing 18 U.S.C. § 922(t)).
[32] *Id.*
[33] *Id.*
[34] *Id.* at 810 (citing 18 U.S.C. § 922(t)).

No. 15-10311

FFLs in other states because the federal background check database may not include all information available to a state, the Government asserts that "states may face logistical and budgetary constraints in submitting information, and they may have privacy laws that prevent sharing of certain records," such as mental health records, and alcohol and drug use information. The Government has not explained how or why a state would be able to provide information such as mental health information for purposes of a transfer of a handgun by an in-state FFL but could not provide that information to an out-of-state FFL. Nevertheless, for the reasons set forth in the panel's majority opinion, the in-state sales requirement withstands strict scrutiny.

## IV

The Government adduced evidence that addresses, in part, the disparate treatment of handguns and long guns under federal laws. When Congress enacted the in-state sales requirement in 1968, statistics reflected that "handguns were used in 70 percent of murders committed with firearms,"[35] and that handguns were used in 78 percent of the firearm-related homicides of police officers killed in the line of duty.[36] The Government also presented evidence that, according to FBI statistics, handguns were the type of weapon involved in at least 70 percent of firearm homicides from 2009 to 2013,[37] and that handguns were used in 73 percent of firearms-related felony homicides of

---

[35] S. REP. NO. 89-1866 (1966), at 5.

[36] *See Fed. Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. On the Judiciary*, 90th Cong. 899 (1968).

[37] *See* CRIM. JUSTICE INFO. SERVS. DIV., FBI, CRIME IN THE UNITED STATES 2013: EXPANDED HOMICIDE DATA, tbl. 8, https://ucr.fbi.gov/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/offenses-known-to-law-enforcement/expanded-homicide/expanded_homicide_data_table_8_murder_victims_by_weapon_2009-2013.xls [https://perma.cc/S7MA-VH8H] (last visited Nov. 29, 2017).

No. 15-10311

law enforcement officials killed in the line of duty from 2004 to 2013.[38]  This reflects that the type of firearm predominantly used in these crimes was a handgun, not a shotgun or rifle, and that the federal government has a compelling interest in addressing the type of weapon most frequently used to commit crimes and in seeking to ensure that state laws regulating the possession and use of that type of weapon are effective.

---

[38] *See* CRIM. JUSTICE INFO. SERVS. DIV., FBI, 2013 LAW ENFORCEMENT OFFICERS KILLED AND ASSAULTED, tbl. 27, https://ucr.fbi.gov/leoka/2013/tables/table_27_leos_fk_type_of_weapon_2004-2013.xls [https://perma.cc/8V2C-FPZ7] (last visited Nov. 29, 2017).